**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| BILLY RAY DAVIS, | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 3:10-cv-01145 |
| v. | ) | Judge Wiseman/Brown |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

To:    The Honorable Thomas Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

    This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 14, 17). Plaintiff has also filed a Reply. (Docket Entry 18). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 10). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

    Plaintiff filed an application for DIB on July 11, 2007 and an application for SSI on December 17, 2007, with an alleged onset date of October 30, 2007. (Tr. 9). Plaintiff later amended his alleged onset date to January 1, 2008. (Tr. 142). Plaintiff's application was denied initially and on reconsideration. *Id*. Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which was held on December 7, 2009 before ALJ Barbara Kimmelman. (Tr. 24-61).

In her decision denying Plaintiff's claims, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, hepatitis C, polysubstance abuse, mood disorder with borderline personality features, and estimated borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) meaning he can lift fifty pounds occasionally and 25 pounds frequently. He can engage in frequent postural changes, but only occasionally climb ladders or stairs. He needs to avoid hazards such as heights, moving machinery and operating motor vehicles. He is limited to simple routine tasks, should avoid the public and only occasionally be required to interact with co-workers. He is limited to slow to mid paced work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 27, 1958 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

2

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 9-19).

The Appeals Council denied Plaintiff's request for review on October 4, 2010. (Tr. 1-3). This action was timely filed on December 3, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on November 27, 1958. (Tr. 129). Plaintiff has past work history in construction. (Tr. 149). He worked until he was terminated, on October 30, 2007. (Tr. 148). He has a tenth-grade education. (Tr. 152).[1]

Plaintiff saw Dr. Lou Ponce, a family practice physician, for a variety of complaints, including stomach ache, hepatitis C, back pain, and depression/anxiety, from approximately 2002 through 2007. (Tr. 219-336).

Plaintiff had an MRI of the lumbar spine on April 5, 2002. (Tr. 273). The radiologist noted a focal herniated disc at the L4-L5 level in a left paracentral location. *Id.*

On April 29, 2006, Plaintiff had an MRI of the lumbar spine, at Dr. Ponce's request. (Tr. 271). The radiologist, Dr. William Kraft, noted that there were degenerative changes in the L3-4

---

[1] At his hearing, Plaintiff testified that he finished the seventh grade and did not continue his education. (Tr. 43).

3

and L4-5 discs with an L4-5 annular tear. *Id*. Dr. Ponce recommended on June 15, 2006 that Plaintiff perform strengthening and range of motion exercises for his back. (Tr. 299). Dr. Ponce believed Plaintiff's discomfort would be relieved by doing those exercises daily. *Id*. At a September 19, 2006 appointment, Dr. Ponce noted Plaintiff's MRI showed no evidence of impingement, although there was narrowing of the canal in the lumbar area along with disc herniation. (Tr. 298).

After a number of appointments suggesting Plaintiff see his gastroenterologist, Dr. Ponce "insisted" Plaintiff again see a specialist for hepatitis C treatment on November 20, 2006, as Plaintiff's viral load was 6.1. (Tr. 296). On July 23, 2007, Dr. Ponce noted Plaintiff did not want to pursue chemotherapy for his hepatitis C. (Tr. 284). Plaintiff had a liver biopsy on December 14, 2007, which showed inflammatory grade 2 and fibrosis stage 2 hepatitis, a mild increase in hepatic iron stores, and increased portal fibrous tissue. (Tr. 339-42).

Plaintiff sought care at the VA from July 27, 2007 through March 19, 2008. (Tr. 372-85). On July 27, 2007, he complained of lightheadedness and weakness occurring while driving, though he was being treated for this by his primary care physician. (Tr. 382). On August 29, 2007, he indicated he had consumed no alcohol in the past year and quit smoking cigarettes approximately two to three years ago. (Tr. 378). He stated he had never used illicit drugs. *Id*.

Disability services referred Plaintiff to Marie E. LaVasque, MS, MA, for a mental status examination on January 17, 2008. (Tr. 343-46). Ms. LaVasque asked Plaintiff about substance abuse, and Plaintiff reported he was arrested for DUI in the past and was more recently involved in a car accident resulting in his arrest. (Tr. 343). Plaintiff stated he was on prescribed narcotics and had been for 28 years. *Id*. He also admitted to alcohol abuse in the past and multiple

4

instances of blackouts, though he claimed that he quit drinking at his mother's request. *Id*.

Plaintiff stated that he lost his job with AT&T after having the accident. *Id*. Plaintiff reported

quitting school in the 10th grade and joining the Army for three years. *Id*. Plaintiff told Ms.

LaVasque that he lives with a single female friend, but they do not have an intimate relationship.

*Id*. He spends his days worrying and does not like to be around people. *Id*. His friend does the

shopping and most of the cooking, though Plaintiff can heat frozen dinners. *Id*. He is able to

shower and dress daily. *Id*.

Ms. LaVasque noted Plaintiff appeared disheveled but adequately groomed, with a

slouched posture and normal gait. (Tr. 344). Plaintiff was unable to spell his friend's first name,

Teresa. *Id*. She described his affect as flat, and Plaintiff stated his mood was "nervous." *Id*. She

stated Plaintiff was "elusive" and "appeared suspicious." *Id*. Plaintiff admitted he sometimes has

ideas of suicide but did not think he would do it. *Id*. Ms. LaVasque noted Plaintiff's responses

were "vague and superficial," and she was not sure "whether this was due to an attempt to hide

information, or due to psychiatric illness, or a combination of the two" and therefore believed the

results "should be considered a minimal estimate of current functioning level." *Id*.

Plaintiff's friend, Teresa Lee, asked to speak to Ms. LaVasque alone and reported

Plaintiff had a "bad temper." (Tr. 344). According to Ms. Lee, Plaintiff throws things, loses his

temper, and stays to himself. *Id*. He also became upset when Ms. Lee went to the home of a

single male neighbor. *Id*.

Ms. LaVasque evaluated Plaintiff's attention within a structured setting as poor and noted

Plaintiff had difficulty spelling a familiar word backward. (Tr. 344). He could not perform Serial

Sevens and made several errors when asked to perform Serial Threes. *Id*. Plaintiff's speech was

"pressured and rambling," and he "tended to stray off topic." *Id.* She evaluated his intellectual

functioning in the Borderline range. *Id.* His short-term memory appeared to be intact but his

concentration was mildly to moderately impaired. *Id.* Ms. LaVasque evaluated Plaintiff's GAF[2]

at 51. (Tr. 345). She believed he would have difficulty following complex instructions and some

difficulty following short, simple instructions. *Id.* He could not complete his self-report forms

independently, but she believed that may be due to poor reading and writing skills. *Id.*

Plaintiff's mother completed a function report on his behalf dated January 29, 2008. (Tr.

162-66). She stated that Plaintiff spends the day in bed watching television and sleeping. (Tr.

162). He cannot stand being around other people. *Id.* Plaintiff is unable to take care of his

personal needs as he did in the past due to his depression. (Tr. 163). Plaintiff is able to prepare

frozen dinners and sandwiches. (Tr. 164). He does not do housework because he gets dizzy and

blacks out. *Id.* He does not drive and walks outside a couple of times a day. (Tr. 165). He visits

his mother approximately 3 to 4 times per week. (Tr. 166).

Dr. Terry W. Banks completed a consultative records review and residual functional

capacity ("RFC") assessment dated February 13, 2008. (Tr. 347-54). Dr. Banks believed Plaintiff

could occasionally lift and/or carry 50 pounds, could frequently lift and/or carry 25 pounds, could

---

[2]  The Global Assessment of Functioning test is a
> subjective determination that represents the clinician's judgment of the
> individual's overall level of functioning. It ranges from 100 (superior
> functioning) to 1 (persistent danger of severely hurting self or others,
> persistent inability to maintain minimal personal hygiene, or serious
> suicidal act with clear expectation of death). . . . A GAF of 41 to 50
> means that the patient has serious symptoms ... OR any serious
> impairment in social, occupational, or school functioning (e.g., no friends,
> unable to keep a job). A GAF rating of 51 to 60 signals the existence of
> moderate difficulty in social or occupational functioning.

*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

6

stand and/or walk a total of about 6 hours in an 8-hour workday, could sit for a total of about 6 hours in an 8-hour workday, and would be unlimited in pushing and/or pulling. (Tr. 348). Dr. Banks based this assessment on Plaintiff's hepatitis C diagnosis and decision not to proceed with recommended therapy and on Plaintiff's April 2006 MRI. (Tr. 354).

Larry W. Welch, Ed.D. completed a psychiatric review of Plaintiff's records dated March 4, 2008. (Tr. 355-67). Dr. Welch noted Plaintiff was moderately restricted in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 365). Dr. Welch also completed a mental RFC. (Tr. 368-70). He opined that Plaintiff was moderately limited in one out of three categories of understanding and memory, in seven out of eight categories of sustained concentration and persistence, in three out of five categories of social interaction, and in all four categories of adaptation. (Tr. 368-69). Plaintiff was also evaluated as being markedly limited in the ability to interact appropriately with the general public. (Tr. 369). Dr. Welch believed Plaintiff was able to understand, remember, and complete simple and lower levels of detailed tasks on a regular and continual basis with occasional difficult and to deal appropriately with social interaction with occasional direction. (Tr. 370).

Plaintiff was evaluated by a mental health practitioner at the VA on March 19, 2008. (Tr. 374-76). He stated he could no longer work due to black-outs and hepatitis. (Tr. 374). Plaintiff believed he might have bipolar disorder. *Id*. Plaintiff complained of a depressed mood and anxiety. (Tr. 375). His GAF was evaluated at 60. (Tr. 376).

Dr. Reeta Misra completed a review of Plaintiff's medical records and an RFC dated March 24, 2008. (Tr. 403-10). Dr. Misra concluded Plaintiff's impairment was severe but short of the listings and affirmed the prior decision. (Tr. 410). Dr. Misra's RFC was largely identical to

Dr. Banks's RFC. (Tr. 403-10).

Robert L. Paul, Ph.D. completed a second psychiatric review of Plaintiff's records dated April 21, 2008. (Tr. 386-401). Dr. Paul affirmed Dr. Welch's decision. (Tr. 398). His RFC does not differ significantly from that issued by Dr. Welch. (Tr. 399-401).

On August 11, 2008, Plaintiff's hepatitis C - genotype 3 was measured at a viral load 8.6 million. (Tr. 606). The VA physician noted that Plaintiff was having active issues with depression, so treatment for hepatitis C, which can exacerbate depression issues, was not the best option at that time. *Id.*

At an August 20, 2008 appointment at the VA for back pain, Plaintiff reported the pain intensity was around an 8 on a scale of 0-10, and the range varied between 0 and 10. (Tr. 560-61). Plaintiff also stated that he quit smoking and drinking alcohol "a few years back." (Tr. 562). The treating physician recommended an epidural steroid injection, a physical therapy consultation, and an MRI and lumbar CT scan. (Tr. 563-64).

Plaintiff was referred to the physical therapy clinic at the VA. (Tr. 559). On September 11, 2008, Plaintiff was issued a TENS unit and taught exercises to perform at home. (Tr. 560).

On September 18, 2008, Plaintiff had an MRI of the lumbar spine. (Tr. 546). Dr. James W. Miller, the radiologist, noted that Plaintiff had degenerative disc disease to varying degrees from L2 through L5, with mild right convexity scoliosis. *Id.* More specifically, there was mild focal right lateral disc protrusion in the vicinity of the lateral recess and neural foramen at L2-3, mild diffuse circumferential disc bulging at L3-4, and a broad base mild posterior disc protrusion at L4-5 resulting in mild spinal stenosis without significant foraminal stenosis. *Id.*

Plaintiff was given a psychological examination at the VA on February 20, 2009. (Tr.

8

443-46). His GAF was evaluated at 55-60. (Tr. 446). Plaintiff stated that, while in jail on a domestic violence charge, he was detoxed from Valium. (Tr. 444). The psychiatrist, Dr. Karyn Brown, described Plaintiff as "very focused on resuming Valium," but she would not restart Valium because of Plaintiff's previous complaints of blackouts, memory problems, and his hepatitis C history. (Tr. 444). Dr. Brown also noted Plaintiff was seeking disability for his "bipolar," but the psychiatrist believed Plaintiff did not suffer from bipolar disorder. *Id*. Dr. Brown described Plaintiff as a "drug seeking patient[]." (Tr. 446).

At an appointment with Dr. Brown on April 27, 2009, Plaintiff admitted to having a beer "every now and then" and obtaining Valium from friends occasionally. (Tr. 432). Dr. Brown again noted his symptoms were not consistent with bipolar disorder. (Tr. 433).

On May 12, 2009, Plaintiff saw Dr. Corey Campbell at the VA because he exhibited suicidal ideation. (Tr. 417-23). Plaintiff was inconsistent in his statements regarding drug and alcohol use during this appointment. Plaintiff told Dr. Campbell he "occasionally" uses Xanax and that he last took it three days prior to the appointment, but at another time during the appointment, Plaintiff stated it had been "weeks" since he took Xanax. (Tr. 419). Plaintiff also initially stated he did not drink and last drank alcohol three years ago, but he later admitted he drank a beer about a month before the appointment. *Id*. Dr. Campbell assessed his GAF at 25-30. (Tr. 422). Because of Plaintiff's admitted suicidal ideation, Dr. Campbell admitted him for treatment on May 12 on an involuntary status. *Id*. At his intake for inpatient care, Plaintiff stated he had consumed alcohol approximately two to four times a month in the past year and that he had also used Valium and Xanax obtained from a friend. (Tr. 520). On May 15, 2009, Dr. Harry Gwirtsman noted he believed Plaintiff was improving and that he would likely be ready for

9

discharge within two to four days. (Tr. 468). On the same date, Plaintiff's GAF score was measured at 35. *Id*. Plaintiff was discharged on May 18, 2009. (Tr. 578).

At his hearing, Plaintiff testified that he cannot work due to hepatitis C, back pain, and depression. Plaintiff completed the seventh grade and did not earn a GED. (Tr. 32, 43). He can read and write. (Tr. 43). He stopped work in November or December 2007 after blacking out and having a motor vehicle accident at work. (Tr. 29-31).

In 1977, while a member of the military, Plaintiff was diagnosed with hepatitis C. (Tr. 32). Plaintiff stated that he experiences symptoms from hepatitis C, including weakness and dizziness. (Tr. 33). He cannot be treated for hepatitis C due to his depression. (Tr. 33, 52-53).

Plaintiff also suffers from back and leg pain. (Tr. 33-35). He experiences a tingly feeling that goes into his hip and leg. (Tr. 35). He cannot bend over without pain. *Id*. He can stoop, but stooping for too long causes numbness. *Id*. Plaintiff uses a TENS unit, which was prescribed by the VA, for his back pain. (Tr. 36). He testified that the TENS unit makes him forget the pain but does not otherwise relieve it. (Tr. 36-37). He does not exercise but stands flat against the wall for about five minutes and tries to move his arms up and down. (Tr. 37).

Plaintiff estimated he can lift approximately 15 to 25 pounds a few times, but he will have some discomfort over the next day or two. (Tr. 36). He can lift 5 to 10 pounds without discomfort. *Id*. He can sit for 15 to 30 minutes at the longest. (Tr. 37). If he sits on his left side, the pain is not too bad. (Tr. 48). Plaintiff testified he can walk approximately 25 to 30 yards before sitting down. (Tr. 49). Most of the time, he does not get through the entire house without sitting down. (Tr. 49-50).

With regard to his mental impairments, Plaintiff testified he has problems sleeping due to

Seroquel. (Tr. 38). He can be around people, as long as no one is yelling at him, as people did when he was working. *Id*. He cannot operate machinery on his current medication. (Tr. 38-39). He cannot control his temper at times, and he testified he almost got put in jail twice because of "slight bi-polar." (Tr. 50). Plaintiff was incarcerated for approximately three months in October 2008. (Tr. 50-51).

Plaintiff was hospitalized for his mental health due to suicidal ideation and asking his sister about the guns he had locked up in the safe. (Tr. 53). Plaintiff was also experiencing bad anxiety spells, with sweating and jerking. (Tr. 53-54). Plaintiff stayed in treatment for five days. (Tr. 54). The VA suggested Plaintiff go to the VA hospital in Murfreesboro for 30 days, but Plaintiff did not have transportation. *Id*.

Plaintiff testified that he smoked for "quite a few years" but was able to quit at will. (Tr. 41). He stated he smoked for about a month approximately eighteen months before his hearing. *Id*. Plaintiff no longer drinks alcohol, and he claims he was never an alcoholic. *Id*. He had "a couple of beers" in summer 2008 or 2009. *Id*. He does not take illegal drugs, but he tried marijuana and other drugs while he was in the military. (Tr. 42).

Plaintiff stated he was on narcotics since 1983 or 1984, off and on. (Tr. 51). A psychiatrist in Florida prescribed Valium, Hydrocodone, and Soma to Plaintiff in 1984. *Id*. Plaintiff continued taking this medication until he was incarcerated. *Id*. After his release, the VA prescribed Seroquel only. *Id*. Plaintiff testified he gets so nervous he cannot control his emotions or temper while taking only Seroquel. (Tr. 52).

Plaintiff lives with his older sister. (Tr. 44). On a typical day, Plaintiff watches TV, lays in bed, and straightens his bed and room. (Tr. 33-34, 44-46). He testified he could sleep 22 of 24

hours if it was dark outside. (Tr. 46). His sister does the shopping and cooking. (Tr. 44). Plaintiff

has helped her shop a few times, but he has no interest in going. (Tr. 45). Plaintiff ended a long-

term relationship of approximately 29 years in 2006 or 2007. (Tr. 48).

Plaintiff believes his mental impairments are his primary reason for being unable to work.

(Tr. 47). He sometimes feels suicidal. (Tr. 47).

Dr. Pedro Roman, the Vocational Expert ("VE"), testified that Plaintiff's past work

should be characterized as construction laborer, heavy. (Tr. 56). The ALJ asked the VE to assume

a person of Plaintiff's age, education, and work background who could lift 50 pounds

occasionally and 25 pounds frequently; could sit, stand, and/or walk up to six hours each in an

eight-hour workday; could frequently engage in postural activities and occasionally climb

ladders, ropes or scaffolds; would be limited to simple, routine, repetitive tasks; should avoid

working with the public and should only occasionally interact with co-workers; should not work

around any hazards; and should have slow to moderate paced work. (Tr. 57-58). The VE believed

that such a hypothetical person could perform cleaner two, which has approximately 3,000-4,000

jobs in Tennessee at the medium and light exertional levels and approximately 270,000 in the

national economy at the medium and light exertional levels. (Tr. 58). The VE also believed that

such an individual could work as a farm worker vegetable, classified as medium, with 445 at the

medium exertional level in Tennessee and 11,339 in the national economy at the medium

exertional level. (Tr. 58). The individual could also work as a kitchen helper, with 5,783 in

Tennessee at the medium exertional level and 2,891 at the light exertional level and, for the

national economy, 280,441 at the medium exertional level and 140,221 at the light. (Tr. 58).

The ALJ then asked the VE to assume a hypothetical person with the same age and

background but who could lift 20 pounds occasionally and 10 pounds frequently; could sit, stand, and/or walk for up to six hours each in an eight-hour workday but would require the ability to change positions at will every 30 minutes; could occasionally engage in postural activities but could not climb ladders, scaffolds, and ropes; should avoid all hazards; would be limited to simple and routine tasks and slow or moderate paced work; and should avoid the public and only occasionally work with co-workers. (Tr. 58-59). The VE responded that the cleaner jobs at the light exertional level, mold cleaner, would still be available. (Tr. 59). In addition, the position of spice mixer, with approximately 1,500 jobs in the Tennessee economy and 111,000 in the national economy, would also be available. (Tr. 59-60).[3] In addition, the hypothetical individual could work as a packing line worker, with approximately 4,600 jobs in the Tennessee economy and approximately 158,000 jobs in the national economy. (Tr. 60).

Plaintiff's attorney asked the VE whether any jobs would exist if Plaintiff's testimony that he could sit 15 to 30 minutes, stand about five minutes, and walk 25 to 30 yards were taken as fully credible by the ALJ. (Tr. 60). The VE believed that it would be very difficult for someone to work under those conditions. *Id.*

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff alleges seven errors committed by the ALJ. First, the ALJ erred in finding Plaintiff has the RFC to perform medium work. Second, the ALJ failed to properly evaluate Plaintiff's medically determined impairments. Third, the ALJ erred by concluding Plaintiff had no more than moderate mental limitations based solely on his GAF scores. Fourth, the ALJ erred by not calling a Medical Expert to testify at the hearing. Fifth, the ALJ erred by failing to

_____

[3] The VE testimony is somewhat unclear as to whether these numbers apply to the spice mixer or the mold cleaner position.

13

consider the opinion of consultative examiner, Marie LaVasque. Sixth, the ALJ failed to properly

follow VE testimony. Seventh, the ALJ did not properly evaluate and assess the credibility of

Plaintiff's statements as required by SSA Ruling 96-7p.

A.    Standard of Review

        This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

purpose of this review is to determine (1) whether substantial evidence exits in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

        "Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more

than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d

244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the

decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203

F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record

was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v.

Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).


B.    Proceedings at the Administrative Level

        The Claimant has the ultimate burden to establish an entitlement to benefits by proving

his or her "inability to engage in any substantial gainful activity by reason of any medically

14

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.    The ALJ Properly Found Plaintiff Can Perform Medium Work

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Plaintiff challenges the ALJ's RFC assessment, arguing that the ALJ did not properly consider all the evidence, particularly Plaintiff's 2008 MRI of his lumbar spine. (Tr. 546). The Commissioner argues that the ALJ did, in fact, examine the full results of the MRI in light of Plaintiff's treatment history. The Magistrate Judge agrees with the Commissioner.

The ALJ clearly examined the full results of Plaintiff's 2008 MRI. (Tr. 13). She accurately stated that "[t]o discern the effect of these bulges, the record of regular office visits must be examined."[5] *Id*. She then examined Plaintiff's treatment history for back and neck pain, from 2005 through 2008. (Tr. 14). As late as March 2008, Plaintiff complained that he could not work due to blackouts and hepatitis, not back pain. (Tr. 374). Plaintiff did not mention back pain in his application. (Tr. 147-53). The Magistrate Judge believes the ALJ properly evaluated the objective evidence and Plaintiff's subjective complaints in determining Plaintiff's RFC.[6]

D.      The ALJ Properly Evaluated Plaintiff's Medically Determinable Impairments

Plaintiff argues that the ALJ failed to properly evaluated Plaintiff's hepatitis C in her decision. The Commissioner argues that Plaintiff has not offered any evidence that hepatits C impacts his ability to work, and the Magistrate Judge agrees.

While the ALJ determined that Plaintiff's hepatitis C was a severe impairment, she did not directly address it in determining Plaintiff's RFC. (Tr. 13-17). In her credibility assessment, she did note that Plaintiff testified "that he could not get hepatitis treatment because of his need for

---

[5] Plaintiff argues that this statement is essentially equivalent to the ALJ diagnosing the severity of Plaintiff's condition. To the contrary, the ALJ examined Plaintiff's full medical records regarding his back and neck pain and determined a medium work RFC was appropriate. The Magistrate Judge believes the ALJ had substantial evidence for this determination.

[6] It should be noted that Plaintiff alleges other errors with regard to the determined RFC, and those more specific errors are addressed in the appropriate subsections.

16

antidepressents" but that he declined chemotherapy treatment in 2007 without any indication that there were complications with his antidepressants. (Tr. 16, 285). There are no records from Plaintiff's gastroenterologist in the administrative record. Plaintiff had to be repeatedly urged by Dr. Ponce to return to his gastroenterologist when his viral load was high. (Tr. 296-97). While Plaintiff testified that hepatitis C causes weakness and dizziness, he has not offered evidence that these symptoms are disabling. (Tr. 33). Plaintiff's medical records repeatedly mention monitoring of his hepatitis C condition, but there are no indications that his daily activities are greatly hindered by the virus, and his liver biopsy in 2007 was essentially normal. (Tr. 339-42). In reality, Plaintiff's hepatitis C has been largely asymptomatic, according to the objective and subjective evidence, and the ALJ had substantial evidence for concluding that Plaintiff's hepatitis C has essentially no bearing on his ability to work.

E.     The ALJ Properly Evaluated Plaintiff's GAF Scores

       Plaintiff's argument is somewhat contradictory on this point. Plaintiff argues that the ALJ failed to mention Plaintiff had been assigned GAF scores of 25, 30, 35, and 45 but also asserts the ALJ should have relied on treatment notes rather than Plaintiff's GAF scores. The Magistrate Judge agrees with the Commissioner that the ALJ properly evaluated Plaintiff's mental complaints.

       As an initial matter, both parties correctly point out that GAF scores are not themselves determinative of disability. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). Here,

17

Plaintiff had a wide range of GAF scores, from 25 to 60. The lowest GAF scores were seen when he was hospitalized for suicidal ideation. (Tr. 417-22, 520-78). Outside that period, Plaintiff's scores were primarily in the 50-60 range. (Tr. 345, 376, 446).

Moreover, the ALJ clearly based her evaluation on Plaintiff's treatment records, not his GAF scores. (Tr. 14-17). The ALJ evaluated Plaintiff's mental records from the VA and from the examining consultant, Ms. LaVasque. *Id*. The ALJ correctly noted that Plaintiff's mental health records show repeated inconsistencies, particularly regarding Plaintiff's claimed use of alcohol and drugs, and suggestions of malingering. (Tr. 15, 418, 444). Plaintiff was also described as a "drug-seeking patient." (Tr. 446). The ALJ properly determined that the severity of Plaintiff's alleged mental impairments was less than alleged due to Plaintiff's credibility. (Tr. 16). It is clear that the ALJ had substantial evidence for her evaluation of Plaintiff's mental allegations.

F.    The ALJ Was Not Required to Call a Medical Expert to Testify

Plaintiff relies on Social Security Ruling (SSR) 96-6p, 1996 WL 374180 (S.S.A. 1996), to argue that the ALJ was required to call a medical expert to testify regarding the severity of Plaintiff's back problems. SSR 96-6p provides that an ALJ must obtain an updated medical opinion in two circumstances:

> [w]hen no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or [w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id*. Plaintiff essentially argues that the evidence in the record of Plaintiff's back pain supports a judgment of equivalence with the listed impairments and, therefore, the ALJ was required to

obtain an updated medical opinion.

In order to equal a listed impairment, the ALJ must consider all of Plaintiff's impairments in combination. *See Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991). A claimant's "impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs, and laboratory findings as shown in the medical evidence are at least equal in severity and duration to the listed impairments most like the claimed impairment," and "such a decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques." *Dorton v. Heckler*, 789 F.2d 363, 366 (6th Cir. 1986). Here, the ALJ clearly considered all Plaintiff's medical evidence regarding his back pain, as noted above. The statement Plaintiff refers to, that "[t]o discern the effect of these bulges, the record of regular office visits must be examined," merely previews the next paragraph examining Plaintiff's complaints of neck and back pain. (Tr. 13-14). As described above in the discussion of Plaintiff's determined RFC, the ALJ considered Plaintiff's full medical record and treatment for back pain. The ALJ had substantial evidence for determining Plaintiff's back problems did not meet or medically equal a listed impairment. Given this determination, the ALJ had no obligation to call a medical expert to testify, and Plaintiff's argument should fail.

G.      The ALJ Properly Considered Ms. LaVasque's Opinion

Plaintiff argues that the ALJ improperly relied on Ms. LaVasque's opinion only to the extent that it supports the RFC finding. Plaintiff specifically cites Ms. LaVasque's opinion that Plaintiff "would have difficulty following both simple, short instructions and complex instructions" in a structured environment and "would likely have difficulty with coworkers and supervisors," as well as Ms. LaVasque's opinion that Plaintiff's cognitive skills appeared limited.

19

(Tr. 345).

The ALJ somewhat briefly reviewed Ms. LaVasque's evaluation and Dr. Welch's psychiatric evaluation, which incorporated Ms. LaVasque's evaluation by reference. (Tr. 14-15, 343-46, 355-70). She noted Ms. LaVasque diagnosed Plaintiff with borderline personality disorder and borderline intellectual functioning but discounted this assessment because Plaintiff's GAF was measured at 51 and because Ms. LaVasque noted that the "results should be considered a minimal estimate of current functioning level." (Tr. 14-15, 344). As the Commissioner points out, Ms. LaVasque did not indicate what degree of "difficulty" Plaintiff would have in following short, simple instructions or in interacting with coworkers and supervisors. In his psychiatric evaluation, incorporating Ms. LaVasque's opinion, Dr. Welch opined Plaintiff was not significantly limited in the ability to understand and remember very short and simple instructions but was moderately limited in the ability to carry out such instructions. (Tr. 368). He also believed Plaintiff would be moderately limited in interacting with coworkers and supervisors but that he could ask simple questions or request assistance. (Tr. 369). Dr. Welch's opinion does not appear to be inconsistent with Ms. LaVasque's evaluation and assessment. Plaintiff has not demonstrated that the ALJ's consideration of Ms. LaVasque's opinion was improper, and the Magistrate Judge believes the ALJ had sufficient evidence for her mental RFC assessment.

H.     The ALJ Properly Followed VE Testimony

Plaintiff argues that the ALJ improperly rejected the VE's testimony that Plaintiff would not likely be able to work if Plaintiff's testimony regarding his pain and mental issues were given full credibility. The Magistrate Judge believes the ALJ properly considered the VE testimony. The ALJ posed several hypothetical questions to the VE that incorporated the ALJ's determined RFC

20

and other limitations. (Tr. 57-60). Plaintiff's attorney asked the VE whether, if Plaintiff's testimony was determined to be fully credible, Plaintiff would be able to work. (Tr. 60). The VE testified that it would be "very difficult for someone to work under those conditions." *Id.* Plaintiff, however, fails to note that the ALJ did *not* give full credibility to Plaintiff's testimony.[7] Therefore, the ALJ was not required to credit this particular aspect of the VE's testimony, and Plaintiff's argument should fail. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

I.      The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff argues that the ALJ improperly assessed Plaintiff's credibility in violation of SSR 96-7p, 1996 WL 374186 (S.S.A. 1996). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). Here, the Magistrate Judge believes the ALJ had substantial evidence for her credibility finding.

The ALJ discounted Plaintiff's claims as to the severity of his symptoms for several reasons. She cited several instances in the administrative record where Plaintiff was inconsistent regarding his use of drugs and alcohol, his level of education, his medical treatment, and his symptoms. (Tr. 16). Plaintiff's medical records reflect repeated instances of conflicting statements regarding his use of alcohol and drugs. (Tr. 343-46, 418, 432, 475, 520). He was also described as

---

[7] As discussed further *infra*, the ALJ properly evaluated Plaintiff's credibility.

"drug-seeking." (Tr. 444, 446). Even accepting as true Plaintiff's proposition that he did not comply with chemotherapy treatments in 2007 because it would negatively impact his mental health, there is more than substantial evidence for the ALJ to discount Plaintiff's credibility. Therefore, the Magistrate Judge believes this argument should fail.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 19th day of October, 2011.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge

22